UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY PERKINS,<br><br>            Plaintiff,<br><br>    v.<br><br>NATIONAL EXPRESS CORPORATION, DURHAM SCHOOL SERVICES, L.P., PETERMANN LTD., AND KIRK TOSTENRUDE,<br><br>            Defendants. | Case No. 14-cv-02347-NC<br><br>**SUMMARY JUDGMENT ORDER**<br><br>Re: Dkt. No. 63 |

Defendants National Express Corporation, Durham School Services, L.P., and Petermann Ltd. (collectively "Durham") and Kirk Tostenrude move for summary judgment on plaintiff Jimmy Perkins' claims for racial discrimination, hostile work environment, breach of contract, invasion of privacy, violation of California's Unfair Competition Law, and wrongful termination. Perkins' action stems from a drug test that Durham required Perkins to take on November 13, 2012, in accordance with the company's policy of randomly drug testing its employees.

Perkins, who is African American, claims that Durham selected him for drug testing multiple times within a nine-month period and subsequently terminated him because of his race. Because there are triable issues of material fact, the Court DENIES defendants' motion as to the race-discrimination claims. Specifically, a reasonable jury could find from the context that the term "player's" or "pimpmobile" uttered to Perkins by a Durham

Case No.: 14-cv-02347-NC

manager carries discriminatory meaning on the basis of race.  Moreover, Perkins presents evidence that Durham left a similarly-situated white employee off of the drug-testing pool, effectively insulating this person from testing.

The Court, however, GRANTS defendants' motion as to the breach-of-contract and privacy claims; Perkins has not shown evidence that would lead a reasonable jury to find that an implied-in-fact contract existed or that Perkins had a reasonable expectation of privacy.

I. BACKGROUND

Durham is in the business of transporting children to school and first hired Perkins as a driver in February 2003 at its Hayward, California Customer Service Center.  Dkt. Nos. 1-1 at 17; 63-2 at 7.  Though he resigned six months later, Perkins reapplied for a driver position with Durham again in late 2008, Dkt. No. 63-2 at 7-9, and started work at the Hayward location as a driver in April 2009, Dkt. No. 63-15 at 6.

Starting in June 2010, Durham promoted Perkins to managerial positions.  First, Durham promoted Perkins to Site Supervisor at its facility in Livermore, California.  Dkt. No. 63-2 at 12. Since his promotion into management in 2010, Perkins maintains that he has not driven a bus.  Dkt. No. 60-2 at 9-10.  In February 2012, Durham again promoted Perkins, this time to Operations Supervisor at its Hayward location.  Dkt. No. 63-3 at 80-83.  Regional Manager Kirk Tostenrude approved Perkins' new appointment and compensation.  Dkt. No. 63-14 at 2-3.  Tostenrude, a white male, served as the Pacific Northwest Regional Manager for Durham in 2012.  Dkt. Nos. 60-4 at 14, 19; 63-14.

As described in more detail in the sections below, Perkins states that Tostenrude made racially offensive remarks to him, including that Perkins drove a "player's" or "pimpmobile," and took discriminatory actions against him during his tenure as Operations Supervisor.  Dkt. No. 69-3 at 22.  For instance, Perkins contends that Tostenrude made it more difficult for Perkins to transfer from Livermore to Hayward.  *See* Dkt. No. 69-7 at 8.  According to Perkins, Tostenrude required him to formally apply for the Operations Supervisor position in Hayward while not requiring a female white manager in Durham's

San Mateo, California location to go through the same formal procedures before being similarly transferred to Hayward. *See* Dkt. Nos. 60-2 at 7-8; 63-8 at 12-13. In February 2012, Durham offered the San Mateo manager, Eileen Noonan, a position in Hayward as the Safety and Training Manager. Dkt. No. 63-8 at 11-12. She later accepted. *Id.* Though Noonan and Perkins held different positions in Hayward, they both served in managerial positions and both had commercial driver's licenses. Dkt. Nos. 63-2 at 31-32; 60-8 at 7.

Durham had a drug and alcohol policy of randomly drug testing employees in "safety-sensitive positions," including bus drivers and employees with commercial driver's licenses. Dkt. No. 63-13 at 13, 26. Under Durham's policy, the selected employee must report to the collection site "<u>immediately upon request of the company</u>" and "within two hours of notification . . . ." *Id.* at 15 (emphasis in original). The policy continues: "Any employee who refuses or fails to comply with the Company's request to undergo drug and alcohol testing in accordance with the provisions of the policy will be terminated." *Id.* at 19. Durham hired third-party vendors to randomly select which employees would be tested. These vendors—TalentWise, Inc. and HireRight, Inc.—applied a computerized algorithm to the pool data (or list of employees) provided by Durham to randomly select individuals for drug or alcohol testing on a monthly basis. *See* Dkt. Nos. 63-12 at 2; 63-10 at 1-2. According to the vendors, the pool data did not include information regarding the employees' race or national origin. *Id.*

Perkins received drug-test notices in March, October, and November of 2012. *See* Dkt. No. 60-2 at 11-14 (Perkins Dep.); Dkt. No. 63-5 at 33 (email between Durham managers Diana Hulsey and Kirk Tostenrude identifying Perkins' three 2012 testing dates). Meanwhile, Perkins' co-worker and Hayward manager Noonan did not appear on the list of employees to be tested as of July 2012. Dkt. No. 61-3 (email from defendants to TalentWise with attachment described as "active employee list for the random pool 7.1.12"). Noonan herself at her March 6, 2015 deposition could not recall being drug tested since 2009. Dkt. Nos. 60-8 at 8.

On November 13, 2012, Perkins received written notice requiring him to

Case No.: 14-cv-02347-NC          3

1  immediately report for a random drug test. Dkt. No. 63-9 at 3-4. He decided not to go in
2  for the test. According to Perkins, he was preoccupied with trying to manage a crisis
3  involving the radios used to communicate with the drivers, which had gone down. Dkt.
4  Nos. 63-3 at 8; 60-2 at 17. When the general manager at Hayward, Diana Hulsey, heard
5  Perkins would not report for testing, she told him, "You only have two hours. You need to
6  get going." Dkt. No. 63-5 at 7. Still, Perkins failed to appear for the drug test that day. *Id.*
7  at 8.

On November 14, 2012, after learning that Perkins did not appear for testing the
previous day, Hulsey considered terminating Perkins for violating company policy. *Id.* at
11. But she first sought guidance from Tostenrude, who advised Hulsey to take some
initial steps including contacting human resources and placing Perkins on administrative
leave to conduct an investigation. *Id.* at 11-13, 37.

On November 28, 2012, Hulsey terminated Perkins for failing to report for a
random drug test within two hours of notification. *Id.* at 27-28; Dkt. No. 63-3 at 91.

On February 10, 2014, Perkins filed a complaint against defendants in state court.
Dkt. No. 1-1. Defendants subsequently removed the case to federal court. Defendants
now move for summary judgment on all of Perkins' claims.

All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C.
§ 636(c). Dkt. Nos. 19, 20.

## II.  LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and
resolving all doubts in favor of the nonmoving party, there are no genuine issues of
material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.
P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when,
under governing substantive law, it could affect the outcome of the case. *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine
if "the evidence is such that a reasonable jury could return a verdict for the nonmoving
party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient.

Case No.: 14-cv-02347-NC                 4

1  *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

2  The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All reasonable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## III.  DISCUSSION

Perkins alleges that Durham (1) engaged in racial discrimination and created a hostile work environment in violation of California's Fair Employment and Housing Act; (2) violated an implied-in-fact-contract; (3) violated his privacy rights under the California Constitution; (4) violated § 17200 of California's Business and Professions Code; and (5) wrongfully terminated him in violation of public policy. Defendants seek summary judgment on all five of Perkins' claims.

As a threshold matter, the Court must resolve Perkins' Rule 56(d) request for additional discovery. A party seeking relief under Rule 56(d) must show "(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *State of California ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998). "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists" and that it would prevent summary judgment. *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir. 1995); *see also Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1100-01 (9th Cir. 2006) (holding that district court did not abuse its discretion by denying request for a continuance under Rule 56(f) where plaintiff did not show that additional discovery

Case No.: 14-cv-02347-NC          5

1    would have revealed specific facts precluding summary judgment).

2        Here, Perkins requests discovery of two additional items: more adequate responses
3    to Interrogatory Number 24 to National Express and to Interrogatory Number 11 to
4    Durham.  Dkt. No. 78 at 2-3 (May 4 discovery letter).  According to Perkins, these
5    interrogatories seek information about Durham's business practices with third party
6    random-drug-test administrators.  *Id.* at 3.

7        At the summary judgment hearing, Perkins argues he was "hindered by [Durham's]
8    late production," and emphasized the need for additional discovery for trial.  Dkt. No. 80,
9    Tr. at 5/06/15, 2:16-2:21.  Yet in his response to defendants' summary judgment motion,
10   Perkins concludes: "Plaintiff submits *adequate* evidence to show genuine issues of
11   disputed material facts fit for a jury to hear."  Dkt. No. 69 at 26 (emphasis added).  Still,
12   Perkins also takes the position that if "the Court cannot deny the [summary judgment]
13   motion in its entirety based upon the evidence available now, [he] urges the Court to allow
14   pointed discovery that should gather salient details still lacking."  Dkt. No. 69-1 at 4.

15       But as defendants point out, Perkins has not explained how additional responses to
16   Interrogatories 24 and 11 are essential to oppose defendants' summary judgment motion.
17   And as Perkins himself admits, he submitted "adequate evidence to show genuine issues of
18   disputed material facts"; in other words, adequate evidence to oppose summary judgment.

19       Accordingly, the Court DENIES Perkins' request for Rule 56(d) discovery.

20   **A.     Perkins' FEHA Claims**
21       **1.     Racial Discrimination**
22   California's Fair Employment and Housing Act prohibits employment
23   discrimination on the basis of race.  Cal. Gov't Code § 12940(a).  "Because of the
24   similarity between state and federal employment discrimination laws, California courts
25   look to pertinent federal precedent when applying [its] own statutes."  *Guz v. Bechtel Nat.*
26   *Inc.*, 24 Cal. 4th 317, 354 (2000).

27       Thus, to survive summary judgment, a FEHA plaintiff may either "proceed by using
28   the *McDonnell Douglas* framework, or alternatively, may simply produce direct or

United States District Court
Northern District of California

circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)); *see also Metoyer*, 504 F.3d at 941 ("California courts apply the Title VII framework to claims brought under FEHA."). When a plaintiff presents indirect proof of racial discrimination, courts apply the burden-shifting test established in *McDonnell Douglas*.

Under that analysis, the plaintiff bears the burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Unlawful discrimination is presumed if the plaintiff can show that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff succeeds, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action taken against the employee. *Id.* If the employer demonstrates a nondiscriminatory reason, the employee must then present evidence that the reason was pretextual. *Id.*

Here, defendants argue that Perkins' FEHA claim cannot survive *McDonnell Douglas*' burden-shifting inquiry. Defendants contend that Perkins' claim does not establish a prima facie case of discrimination because he has not produced evidence suggesting a discriminatory motive. Dkt. No. 63 at 17. According to defendants, none of Perkins' alleged interactions with Durham management suggest a racial motive; this includes the reference Tostenrude made to Perkins about Perkins' car as a "player's" or "pimpmobile." *See* Dkt. No. 69-3 at 22. Additionally, Durham emphasizes that its management had no control over who would be drug tested; instead, it delegated its random-testing-selection process to third-party vendors. *See* Dkt. Nos. 63-12 at 1-2; 63-10 at 1-2.

As to whether defendants treated other employees more favorably, defendants

contend that other similarly-situated white employees were also subject to random testing, including the prior supervisor who held Perkins' position, as well as the supervisor who replaced him. Dkt. No. 63 at 19; *see* Dkt. Nos. 63-12 at 6 (listing former Operations Supervisor Ray Jacobsen in the data pool); 63-15 at 12-15 (identifying Operations Supervisor Pamela Fenton as having been tested).

After reviewing defendants' evidence, the Court finds that material questions of fact preclude summary judgment on Perkins' race-discrimination claim. First, it appears undisputed that Perkins, who is African American, belongs to a protected class, and was performing work satisfactorily up to November 13, 2012. Perkins also produced sufficient evidence to create a prima facie case that similarly-situated individuals outside of his class were either never tested or not tested with the same degree of frequency. *See, e.g.*, Dkt. Nos. 60-8 at 3; 61-3 (white supervisor Noonan not in random drug test pool). As to adverse employment action, the Court finds that Perkins' having to take multiple drug tests within a nine-month period satisfies this element.

The Ninth Circuit has defined adverse employment action "broadly." *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (collecting cases involving termination, negative reference, negative performance reviews, and refusing to consider for promotion). As to random drug testing, courts have held that such testing, even if disproportionate to a plaintiff claiming discrimination, does not constitute an adverse employment action absent some evidence of manipulation. *See, e.g.*, *Figueroa v. City of New York*, 198 F. Supp. 2d 555, 568 (S.D.N.Y. 2002) ("if [plaintiff] had offered evidence that the drug testing policy was manipulated such that she was disproportionately chosen for testing, such evidence could have established an adverse employment action"); *Adams v. American Airlines, Inc.*, 2000 U.S. App. LEXIS 284, at *16 (10th Cir. 2000) ("We assume, without deciding, that, if Adams could prove in this case that the [Interactive Voice Response System] was deliberately manipulated such that Adams was subjected to significantly more drug tests than she otherwise would have been absent such manipulation, such evidence could

Case No.: 14-cv-02347-NC         8

establish adverse employment action for purposes of her prima facie case of retaliation.")

Here, Perkins has offered evidence that a similarly-situated white supervisor, Eileen Noonan, did not appear on the random testing pool, as of July 2012 and cannot recall being tested since 2009. *See* Dkt. Nos. 60-8 at 8; 61-3. Consequently, unlike Perkins, Noonan never received a note requiring her to take a drug test during the 2012 period. Defendants call the pool-data exclusion a "clerical error." Dkt. No 63 at 14. But looking at the evidence in the light most favorable to Perkins, a reasonable jury could find this as evidence of manipulation. *Cf. Figueroa*, 198 F. Supp. 2d at 568 ("because [plaintiff] has offered no evidence as to any manipulation, the drug testing, even if disproportionate to her, is not an adverse employment action").

Notably, defendants challenge only element four of the prima-facie-case requirements, Dkt. No. 63 at 17 ("Here, Perkins, does not, and cannot, meet the fourth element."); they do not challenge the adverse-employment-condition element in their opening brief. And while in their reply brief, defendants argue that "postings, applications, interviews, and the like do not rise to the level of adverse employment actions," Dkt. No. 75 at 6, they never contend that frequent drug testing fails to satisfy the third prima-facie-case element. *See also id.* at 8 ("Perkins fails to offer any evidence that Durham's handling of the investigation resulted in an adverse consequence to his employment").

As to discriminatory motive, Perkins presents evidence of racial animus on the part of Regional Manager Tostenrude, who approved Perkins' appointment to Operations Supervisor at the Hayward facility. *See* Dkt. No. 63-14 at ¶ 3. Perkins testified that he usually commuted to work in his 1994 Volvo. Dkt. No. 69-3 at 22. But when he drove his 2001 CL600 Mercedes-Benz to work, Tostenrude made the comment that Perkins was riding his "player's" or "pimpmobile." *Id.*; *see also* Dkt. No. 69-7 at 14 (Hildago Dep.) (overhearing Tostenrude comment that Perkins had a "pimp ride"). Perkins testified that Tostenrude's statement "referr[ed] to African-American[s] in luxury cars, and I took that offensively." Dkt. No. 69-3 at 22.

"This Court has repeatedly held that a single discriminatory comment by a

Case No.: 14-cv-02347-NC                9

plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Thompson v. C&H Sugar Co.*, No. 12-cv-00391 NC, 2014 U.S. Dist. LEXIS 40431, at *25 (N.D. Cal. Mar. 24, 2014) (internal quotation marks omitted) (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005)); *see also, e.g.*, *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1150 (9th Cir. 1997) (direct evidence of race discrimination where employer referred to a Mexican American employee other than the plaintiff as a "dumb Mexican."); *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) (direct evidence of sexual stereotyping where employer believed that the female candidates get "nervous" and "easily upset"); *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991) (direct evidence of sex stereotyping where employee referred to female plaintiff as "an old warhorse" and to her students as "little old ladies").

Nonetheless, defendants argue that the alleged reference to "player's" or "pimp" is "race-neutral" or "racially ambiguous at best." Dkt. No. 63 at 17-18. But it is precisely this ambiguity that creates a genuine dispute of fact over whether the reference involved a discriminatory racial connotation, given the context. Defendants do cite to a case from a Florida district court, which noted that the comment "pimps and ho's" was "not race-related." *Hansen v. Perry Techs.*, 206 F. Supp. 2d 1223, 1233 n.18 (S.D. Fla. 2002). But the *Hansen* court also noted the context: the comments were "at times made to mixed crowds . . . ." *Id.* Here, Perkins testified that Tostenrude addressed the "pimpmobile" comments to him specifically on the day he drove his Mercedes to work. A reasonable jury could find that the reference to "player's" or "pimp" directed at an African-American male driving a luxury car carries discriminatory meaning.

Second, defendants have offered a legitimate, nondiscriminatory reason for the adverse employment action: Perkins was *randomly* selected to be drug tested on November 13, 2012, his third testing within a nine-month period. Durham later terminated Perkins for his failure to appear for the test within two hours after notification. *See* Dkt. Nos. 63-3 at 40; 63-5 at 27-30.

Case No.: 14-cv-02347-NC                 10

Perkins, however, has produced competing evidence that defendants' justification is pretext: as stated earlier, manager Noonan does not appear on the list of employees to be tested, in contradiction to Durham's mandatory drug testing policy. Durham's policy requires random testing of all "company defined safety-sensitive positions," including employees who are "certified, qualified, or allowed to operate a company vehicle." Dkt. No. 63-13 at 13, 26. This raises the question over why Noonan—who, like Perkins, also held a managerial position, possessed a commercial driver's license, and reported to the general manager, but, unlike Perkins, is white—was never in the pool of employees to be tested in 2012 even though Durham's policy mandated testing of all employees qualified to operate Durham's vehicles. Defendants call the frequency with which Perkins' name was drawn from the pool "bad luck." Dkt. No. 80 (summary judgment hearing), Tr. at 5/06/15, 2:31-2:33. Noonan's apparent good luck creates a dispute of fact over whether the adverse action against Perkins was pretextual. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("A showing that the County treated similarly situated employees outside Vasquez's protected class more favorably would be probative of pretext.").

Accordingly, Perkins' claim passes the *McDonnell Douglas* test and the Court DENIES defendants' summary judgment motion as to the race-discrimination claim.

Similarly, to the extent Perkins' claims under California Business and Professional Code § 17200 (Fourth Cause of Action) and under the doctrine of wrongful termination in violation of public policy (Fifth Cause of Action) are based on the race-discrimination claim described above, defendants' summary judgment motion is also DENIED.

### 2. Hostile Work Environment

To state a hostile-work-environment claim, a plaintiff must allege that (1) he was subjected to verbal or physical conduct because of his protected class, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (racial harassment); *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) (sexual harassment).

In determining whether conduct was sufficiently severe or pervasive, courts look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez*, 349 F.3d at 642 (citations omitted). In addition, "the working environment must both subjectively and objectively be perceived as abusive." *Id.*

Here, Perkins "contends that Defendant Tostenrude's actions add up to harassment." Dkt. No. 69 at 19. In particular, Perkins presents evidence that he believes demonstrates Tostenrude "worked behind the scenes to sabotage Plaintiff and insulted him directly in a racially charged way in using the term 'pimp.'" *Id.* For instance, Perkins states that Tostenrude tried to block Perkins' transfer from the Livermore location to the Hayward location. Perkins points to the deposition testimony of manager Fernando Hidalgo, who testified that it "seemed to be a little more of a difficult process" of moving Perkins from Livermore to Hayward and that Tostenrude, Hidalgo's boss, viewed Perkins as "a problem." Dkt. No. 69-7 at 8 (Hidalgo Dep.). Perkins also testified that Tostenrude questioned why the acting general manager was "transferring trouble over here" when considering Perkins' transfer. Dkt. No. 69-3 at 21 (Perkins Dep.). Perkins further testified that Tostenrude said "caps have always been stuck to [Perkins'] head" in reference to the dress code and Perkins' propensity to wear hats. *Id.*

While Perkins may have found these comments and actions irksome, Perkins ultimately did get transferred from Livermore to Hayward. Moreover, such comments as to Perkins' cap and to his being a "problem" or "trouble," consist of "offhand comments and isolated incidents" that do not "amount to discriminatory changes in the terms and conditions of employment." *See Manatt*, 339 F.3d at 798 (internal quotation marks and citation omitted).

Likewise, Perkins' testimony that Tostenrude made his job "much more challenging" by causing him to work longer hours to learn a payroll program, Dkt. No. 69-3 at 19-20, and Tostenrude's threat of "dire consequences" if Perkins could not get certain

Case No.: 14-cv-02347-NC    12

drivers to come in off their vacations, *id.* at 23, does not show conduct sufficiently severe or pervasive to alter Perkins' employment conditions.  Neither this testimony nor other evidence Perkins offers suggests Tostenrude's alleged discriminatory conduct unreasonably interfered with his work performance, occurred frequently, was physically threatening or humiliating, or severe enough to constitute an abusive work environment.  *See Vasquez*, 349 F.3d at 642 (citations omitted).

What is more, Perkins points to only one instance when Tostenrude used the word "player's" or "pimpmobile."  While Perkins did find the comment offensive as an African American, it alone does not amount to severe and pervasive verbal conduct.  *See Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009) ("For racist comments, slurs, and jokes to constitute a hostile work environment . . . there must be more than a few isolated incidents of racial enmity.") (internal quotations marks and citation omitted); *cf. Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding hostile work environment where co-workers and supervisors called male employee "faggot" and "fucking female whore," among other things, at least once a week and often several times a day).

Therefore, the Court GRANTS defendants' summary judgment motion as to the hostile-work-environment claim.  Similarly, defendants' summary judgment motion as to Perkins' § 17200 and wrongful termination claims is also GRANTED to the extent those claims are based on a violation of FEHA's prohibition on racial harassment.

### B.     Breach of Contract

Under California law, the elements of a breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  (internal quotation marks and citation omitted).  *Pizza v. Fin. Indus. Regulatory Auth., Inc.*, 13-cv-0688 MMC (NC), Dkt. No. 91, 2015 U.S. Dist. LEXIS 37994, at *3-4 (N.D. Cal. Mar. 19, 2015).

Here, Perkins contends that defendants violated an "implied-in-fact promise not to discharge [him] without good cause." Dkt. No. 1-1 at 14.  Defendants argue that no

1   contract existed between Perkins and Durham to limit Perkins' at-will status.  The Court

2   agrees with defendants.  Numerous employment-related documents, including Perkins'

3   2008 job application, Dkt. No. 63-3 at 78, his 2010 offer letter to become a supervisor,

4   Dkt. No. 63-3 at 95, and Durham's employee handbook, Dkt. No. 63-8 at 5 and 16, all

5   either state that Perkins' employment is "at-will" or that the document is not intended to be

6   a contract.  More importantly, Perkins admitted in his deposition that he never received

7   any promise or assurance that his employment would be anything but at-will.  Dkt. No. 63-

8   3 at 53 ("Q. Did you have any information that there had to be good cause for your

9   termination at the time that you were terminated?  A. No. . . . I had the same at-will

10  termination.").

11      Because Perkins has failed to provide evidence of an implied-in-fact contract under

12  which Durham could only terminate him with good cause, the Court GRANTS defendants'

13  summary judgment motion.  Similarly, defendants' summary judgment motion as to

14  Perkins' § 17200 and wrongful termination claims is also GRANTED to the extent those

15  claims are based on a violation of an implied-in-fact contract.

16      **C.    Violation of Privacy**

17      The elements of a privacy claim under the California Constitution are: "(1) a legally

18  protected privacy interest; (2) a reasonable expectation of privacy in the circumstances;

19  and (3) conduct by defendant constituting a serious invasion of privacy." *Hill v. Nat'l*

20  *Collegiate Athletic Assoc.*, 7 Cal. 4th 1, 39-40 (1994).

21      Here, defendants argue that because Perkins has been randomly drug tested in the

22  past (e.g., March 2012), he did not have a reasonable expectation of privacy as to future

23  testing (e.g., November 2012).  The Court agrees and finds Perkins cannot meet the second

24  element under *Hill*.

25      But perhaps most significantly, Perkins admits that Durham possesses an interest in

26  ensuring that its drivers could drive safely.  *See* 63-2 at 36-37 (Q. "So you agree at least,

27  don't you, that employers have a compelling reason to test folks for drugs that may operate

28  machinery, including school buses, to make sure they're not under the influence? . . . [A.]

Case No.: 14-cv-02347-NC                14

They should have the right."); *see also Gonzalez v. Metro. Transp. Auth.*, 73 Fed. Appx. 986, 989 (9th Cir. 2003) ("We have never found random drug testing of employees who perform safety-sensitive functions to be unconstitutional."); *Int'l Bhd. of Teamsters v. Dept. of Transp.*, 932 F.2d 1292, 1304 (9th Cir. 1991) (upholding random drug testing of commercial truck drivers as government has a compelling interest in "ensuring the sobriety and fitness of operators of dangerous instrumentalities or equipment").

Nonetheless, Perkins emphasizes that he never drove buses for Durham as a supervisor despite holding a commercial driver's license. Dkt. Nos. 60 at 14. Therefore, according to Perkins, he does not hold a safety-sensitive position subject to random drug testing. Dkt. No. 69-3 at 13 (Perkins Dep.).

Yet Durham's drug and alcohol testing policy states that "safety-sensitive positions" includes "any office employee who is certified, qualified or allowed to operate a company vehicle." Dkt. No. 63-13 at 13, 26. Defendants argue that it considers operations supervisors like Perkins with a commercial driver's license—and who "may possibly drive a company vehicle"—as holding a safety-sensitive position and thus subject to drug testing. Dkt. No. 63-6 at 45 (Durham's supplemental response to Interrogatory 24). The Court agrees and finds that the frequency with which Perkins may perform the safety-sensitive function (e.g., driving a bus) irrelevant to the analysis of Perkins' reasonable expectation of privacy. *See Gonzalez*, 73 Fed. Appx. at 989 (rejecting plaintiffs' argument that because they seldom performed the safety-sensitive functions they cannot constitutionally be tested; "frequency is irrelevant").

Accordingly, the Court GRANTS defendants' summary judgment motion as to the invasion-of-privacy claim. Similarly, defendants' summary judgment motion as to Perkins' § 17200 and wrongful termination claims is also GRANTED to the extent those claims are based on a violation of privacy.

## IV.  CONCLUSION

Based on this evidence, the Court finds that there are genuine issues of material fact as to whether Perkins presented evidence of racial discrimination. Accordingly, the Court

Case No.: 14-cv-02347-NC            15

1  DENIES defendants' motion for summary judgment as to Perkins' race-discrimination
2  claims as well as Perkins' claims under § 17200 and the doctrine of wrongful termination
3  in violation of public policy, but only to the extent that the latter two claims are based on a
4  theory of race discrimination.  As to all of Perkins' other claims, including his claim for
5  breach of contract and violation of privacy, the Court GRANTS defendants' summary
6  judgment motion.

**IT IS SO ORDERED.**

Dated:  May 15, 2015

_____
NATHANAEL M. COUSINS
United States Magistrate Judge

Case No.: 14-cv-02347-NC                16